MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: 619-758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> PAVEMENT RECYCLING SYSTEMS, INC., a California Corporation, <br><br> Defendant. | Civil Case No. **'21 CV 1138 BAS BLM** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 _et seq._)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.  **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.      On March 26, 2021, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant Pavement Recycling Systems, Inc., as owner and operator of the Facility located at 855 Energy Way, Chula Vista, California 91911 ("Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.      Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.      More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and

in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.     <u>INTRODUCTION</u>

6.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

7.     Specifically, Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters including the Otay River, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

8.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the Clean Water Act and the IGP.

9.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Pavement Recycling System's Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

10.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

11.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters and compromises or destroys their Beneficial Uses.

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, dissolved solids, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm

water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.    The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

### III.    PARTIES

14.    Pavement Recycling Systems, Inc., located at 10240 San Sevaine Way, Jurupa Valley, California 91752, is an active California corporation, entity number C1459029, and is the Owner and/or Operator of the Facility. Reclaimed Aggregates, Inc. is an active Nevada corporation. On information and belief, Reclaimed Aggregates, Inc is a wholly owned subsidiary of Pavement Recycling Systems, Inc.

15.    Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16.    Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and

enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.    "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §§ 125.3(a)(2)(ii)–(iii).

**B.    California's IGP.**

29.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

32.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-*

*DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 & 2020 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 & 2020 Permit § I.A.17.

34.     Violations of the IGP are violations of the Clean Water Act. 1997 Permit § C.1; 2015 & 2020 Permit § XXI.A.

**C.     The IGP Discharge Prohibitions.**

35.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permit § III.A.

36.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 2015 & 2020 Permit § III.B.

37.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 2015 & 2020 Permit § III.C.

38.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. 2015 & 2020 Permit § III.D.

39.     The San Diego Basin Plan prohibits "the discharge of waste to inland

surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

40.    Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

### D.    The IGP Effluent Limitations.

41.    The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permit § V.A.

42.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, and phosphorus, among others.

43.    Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permit § V.A.

44.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 50.

45.    Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permit § V.A.

46.    The 2015 MSGP freshwater EPA Benchmarks include, but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N;

.75 mg/L for aluminum; .014 mg/L for copper; and .12 mg/L for zinc. 2015 MSGP Fact Sheet at 55−56.

### E.   The IGP Receiving Water Limitations.

47.   The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permit § VI.B.

48.   Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

49.   The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 2015 & 2020 Permit § VI.A.

50.   Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

51.   WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

52.   The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

53.   The Beneficial Uses for the Otay River downstream from the Facility's include: non-contact water recreation; warm freshwater habitat; wildlife habitat; rare, threatened, or endangered species; and the potential beneficial use of contact recreation. Basin Plan, Table 2-2.

54.   The Beneficial Uses for San Diego Bay include: contact recreation; non-

contact water recreation; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; marine habitat; estuarine habitat; spawning, reproduction, and/or early development; shellfish harvesting; commercial and sport fishing; navigation; and industrial service supply. *Id*., Table 2-3.

55.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

56.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

57.     According to the 2016 303(d) List, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs"). Specific segments of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane.

58.     Data collected by Coastkeeper from 2008 to 2018, as well as other receiving water monitoring data publicly available on the California Environmental Data Exchange Network ("CEDEN"), indicates the Otay River is impaired for indicator bacteria such as e. Coli and enterococcus, nutrients such as Nitrate + Nitrite ("N+N") and phosphorus, and total dissolved solids ("TDS").

59.     Polluted discharges from industrial facilities, such as the Pavement Recycling Systems Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

60.     The following WQS are established by the Basin Plan for the Otay River: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; manganese, 0.05 mg/L; TDS, 1,000 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

61.   The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; and zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

62.   Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permit § VI.A.

**F.   The IGP Storm Water Pollution Prevention Plan Requirements.**

63.   Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 2015 & 2020 Permit §§ X.A–B.

64.   The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 & 2020 Permit § X.

65.   The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating

activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. 2015 & 2020 Permit §§ X.A–I.

66.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permit § X.B.2.

67.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. 2015 & 2020 Permit § XV.

### G.     The IGP Monitoring and Reporting Requirements.

68.     Permittees must develop and implement a monitoring implementation plan ("MIP"). 2015 & 2020 Permit, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

69.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

70.     The IGP requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permit § XI.A.1.

71.     Section XI.B.1 of the 2015 and 2020 Permits require sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge

for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

72.     The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Section XI.B.2 of the 2015 and 2020 Permits require dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

73.     Section XI.B.11 of the 2015 and 2020 Permits, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results.

74.     The 2015 and 2020 Permits require dischargers to analyze samples for TSS, O&G, and pH, at a minimum.

75.     The 2015 and 2020 Permits require dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants.

76.     The 2015 and 2020 Permits also require dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

77.     The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

78.     The IGP requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. 2015 & 2020 Permit § XXI.K.

### H.     The 2015 Permit Exceedance Response Actions Requirements.

79.     The 2015 Permit includes Numeric Action Levels ("NALs") that are based on EPA Benchmarks. Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." 2015 Permit § I.M.61; 2020 Permit § I.N.75; *see also id.* § I.M.62 and Table 2.

80.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." 2015 & 2020 Permit § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. 2015 & 2020 Permit § XII.C.

81.     Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred. *Id.* By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of IGP ("Level 1 Evaluation"). 2015 & 2020 Permit §§ XII.C.1.a–c.

82.     Although the Level 1 Evaluation may focus on the drainage area(s) where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. 2015 & 2020 Permit § XII.C.1.c.

83.     Based upon the Level 1 Evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the Level 1 Evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the summary of the Level 1 ERA Evaluation, and a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL. 2015 &2020 Permit §§ XII.C.2.a.i–ii.

84.     The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. 2015 & 2020 Permit § XII.C.2.a.iii.

85.     A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. 2015 & 2020 Permit § XII.C.2.b.

86.     NAL exceedances as defined in the IGP are not, in and of themselves, violations of the IGP. However, NAL exceedances indicate that a facility is performing poorly and failing to implement BMPs that achieve BAT and BCT.

87.     A "[d]ischarger that does not fully comply with the Level 1 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." 2015 Permit § I.M.63; 2020 Permit § I.N.77.

## V.     FACTUAL BACKGROUND

### A.     Facility Site Information, Industrial Activities, and Pollutant Sources.

88.     The Facility first obtained IGP coverage to conduct industrial operations on August 3, 2009. The Facility submitted its most recent Notice of Intent ("NOI") to obtain IGP coverage under the 2020 Permit on September 23, 2020 ("2020 NOI"), under Waste Discharge Identification Number 9 37I022251.

89.     According to the 2015 SWPPP, the Facility encompasses six acres, approximately thirty percent of which are covered by asphalt paving or cement surfaces, all of which is used for industrial activities and directly exposed to precipitation and stormwater runoff. The Facility's 2020 NOI states the Facility is five acres, all of which are industrial area exposed to storm water, and that the Facility is ten percent impervious. The 2020 SWPPP states that the Facility is 6.5 acres and one percent impervious.

90.     According to the 2015 SWPPP, the Facility "recycles used concrete and

asphalt from the industrial process." 2015 SWPPP § 3.1.4. The Facility obtains used asphalt, concrete, and other road-base materials from various industrial processes. *Id*. §§ 2.1.1., 3.1.3, 3.1.4. The Facility then crushes, screens, and otherwise reconstitutes the materials into grindings, base materials, and other reusable products it then sells for reuse. *Id*. § 3.1.3. According to various City of Chula Vista inspection reports, the Facility's principle industrial activities include construction recycling, and crushing and aggregate recycling.

91.     General categories of industrial activities conducted at the Facility include loading, unloading, and moving used materials and processed materials around the site; crushing, screening, and otherwise processing used materials for reuse; storage of used and processed materials; and various vehicle and equipment maintenance activities conducted throughout the site.

92.     The SWPPP identifies numerous industrial materials that are stored, handled, and/or otherwise used at the facility, including: used and processed asphalt, concrete, and other road-base industrial materials; various cleaners, solvents, coolants, anti-freeze, and lubricants used for maintenance; hydraulic fuels and oil; gasoline and diesel fuel; and various chemicals.

93.     The Facility Standard Industrial Classification ("SIC") code is listed as 3241 (Cement, Hydraulic), which the 2015 SWPPP explains "is for establishments primarily engaged in manufacturing hydraulic cement, including portland, natural, masonry, and pozzolana cements." *Id*. § 2.1.1. Plaintiffs are informed, believe, and thereon allege SIC code 3241 does not describe the type of industrial activities conducted at the Reclaimed Aggregates Facility.

94.     The 2020 SWPPP states that the SIC codes applicable to the Facility's industrial activities are 1429 (Crushed and Broken Stone, Not Elsewhere Classified), and 1611 (Highway and Street Construction, Except Elevated Highways).

95.     Plaintiffs are informed, believe, and thereon allege, that SIC codes 5093 (Scrap and Waste Materials), 3727 (Concrete Products, except Block and Brick), and

5032 (Brick, Stone, and Related Construction Materials) apply to the Facility.

96.    According to the 2015 SWPPP, the Facility "recycles used concrete and asphalt from the industrial process." *Id*. § 3.1.4. SIC code 5093 applies to "[e]stablishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[1]

97.    The 2015 SWPPP acknowledges that Reclaimed Aggregates sells materials after they are processed. *Id*. § 3.1.3. Once waste concrete is reconstituted into a reusable product, SIC code 3727 applies.

98.    Direct observations, photographs, publicly available images, and the Facility's own documentation indicate that SIC code 5032 also applies to the Facility as there are large stockpiles of various aggregates processed and/or sold at the Facility.

99.    The 2015 SWPPP's pollutant source assessment claims the only activities and associated materials that could potentially contribute pollutants to storm water runoff consist of hydraulic fluids, oils, gasoline, diesel fuel, anti-freeze/coolant, and used oil. *Id*. § 3.2.1.

100.    However, other sections of the same SWPPP acknowledge that the large quantities of asphaltic and concrete-based grindings and/or road-base materials, storage of such grindings and materials, various outdoor equipment storage, and general waste storage areas, may affect the quality of the Facility's storm water discharges. *Id*. §§ 2.1, 3.1.1.

101.    City of Chula Vista inspection documents indicate the Facility's storm water and non-storm water discharges include pollutants such as aggregates into off-site storm drain inlets, tracking of dirt onto Energy Way, sediment and sediment laden water into City of Chula Vista storm water conveyance systems, uncontained and excessive flow of

---

[1] NAICS Association, SIC Industry Description, Industry: 5093—Scrap and Waste Materials, https://www.naics.com/sic-industry-description/?code=5093#:~:text=Establishments%20primarily%20engaged%20in%20assembling,in%20dismantling%20automobiles%20for%20scrap.

mud from dust control watering, and runoff from excessive irrigation.

102.   While the Facility has analyzed its storm water samples only for the minimum parameters of TSS, O&G, and pH, Plaintiffs are informed, believe, and thereon allege numerous additional pollutants associated with industrial activities and materials are present in the Facility's storm water and non-storm water discharges.

103.   The IGP requires SIC Code 5093 facilities to analyze all collected storm water samples for iron, lead, aluminum, zinc, and COD, as these pollutants are commonly present in such operations. 2015 & 2020 Permits § XI.B.6.d. As noted *supra*, SIC Code 5093 applies to the Facility.

104.   The EPA Industrial Stormwater Fact Sheet for Sector E industrial activities further indicates that pollutants associated with the Facility's industrial activities and materials include TSS, pH, COD, lead, iron, zinc, biological oxygen demand ("BOD"), aluminum, arsenic, cadmium, chromium, benzene, and O&G.[2]

105.   Coastkeeper and CERF's experience engaging with facilities with similar industrial activities and industrial materials, indicates that the Facility has a high potential to discharge TDS, nitrogen, and phosphorus in its stormwater and non-stormwater discharges.

106.   The Facility's crushing, screening, and other processing activities generate dust and particulates. As a result, the Facility's activities require and utilize dust-control measures such as watering.

107.   For example, on January 5, 2018, the City of Chula Vista issued a citation to the Facility for "[d]ischarge of sediment and sediment laden water into the City's storm water conveyance system" stemming from NSWDs. The citation specifically noted "[u]ncontained and excessive flow of mud from dust control from [an] on-site water truck," which caused the Facility to discharge "sediment and sediment laden water . . .

---

[2] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector E: Glass, clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities* (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_e_glass.pdf.

into City's storm water conveyance system."

108. Based on the foregoing, Plaintiffs are informed, believe, and thereon allege that numerous additional pollutants associated with industrial activity are present in the Facility's storm water discharges, including TSS, O&G, pH, iron, lead, aluminum, zinc, COD, BOD, arsenic, cadmium, chromium, benzene, TDS, nitrogen, and phosphorus.

109. Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

110. Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring indoors or under partial shelter at the Facility regularly escape via dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

111. Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

112. For example, a City of Chula Vista inspection record dated November 27, 2017, directed the Facility to implement additional BMPs to prevent dirt tracking onto Energy Way.

113. Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

114. Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility,

BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

115.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and wash water, process water, and other non-storm water commingle with storm water, and thus all discharges from the Facility are regulated under the IGP.

116.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

117.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

118.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

119.   Plaintiffs are informed, believe, and thereon allege that the Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

120.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

121.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper and

CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

122.   After receiving Plaintiff's Notice Letter, the Facility Owner and/or Operator revised the SWPPP ("2021 SWPPP"), which was circulated and published to SMARTS on May 24, 2021, one day prior to the expiration of the 60-day notice period. As such, information from the 2021 SWPPP was not incorporated into the Notice Letter.

123.   Although the 2021 SWPPP includes updated Facility information, it does not resolve the majority of the IGP violations identified in Plaintiffs' Notice Letter.

**B.      Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

124.   The Facility is bordered by the Otay Landfill to the north, a salvage yard to the west, a trucking company and a waste hauling vehicle maintenance facility to the east, and Energy Way to the South.

125.   According to the 2015 SWPPP, all of the Facility's acreage is used for industrial activities and is directly exposed to precipitation and stormwater runoff, and the Facility is composed of four drainage areas, DA-1 through DA-4. 2015 SWPPP § 2.3.

126.   According to the 2015 SWPPP, DA-1 is located on the western side of the Facility and primarily used for truck washing activities.

127.   According to the 2015 SWPPP, DA-2, located on the southwestern portion of the site, encompasses the driveway and "a small portion of working area." A

128.   According to the 2015 SWPPP, DA-3 encompasses most of the site, and is where the numerous industrial activities such as material loading, unloading, storage and stockpiling, and processing occurs.

129.   According to the 2015 SWPPP, DA-4 is located in the southern portion of the site and includes an elevated work pad area.

130.   According to the 2015 SWPPP, "[t]he interior of the site includes three drain inlets: two drop inlets and a swale discharging to a pipe inlet tied to the central drop inlet structure." § 2.1. This SWPPP acknowledges three monitoring sites, MP-1 located at the end of truck wash area in DA-1; MP-2 located near the driveway in DA-2; and MP-3 in

the southern portion of the site on the elevated work pad in DA-4. No drainage inlet or monitoring location is designated within DA-3, which is the largest drainage area, and accounts for the vast majority of industrial operations within the site.

131.   The 2021 SWPPP acknowledges four (4) discharge points (DP-1, DP-2, DP-3, and DP-4), but notes that DP-3 is currently being repaired due to a sinkhole collapse in late 2019, and as a result, storm water generated from this drainage area is graded to flow towards the DP-2.

132.   Storm water enters the Facility's various inlets, flows into a subsurface storm water collection system beneath the Facility, under Energy Way and other facilities, and ultimately discharges into the Otay River. The Otay River flows westward and discharges into the south end of San Diego Bay, and eventually the Pacific Ocean.

133.   Plaintiffs are informed, believe, and thereon allege the Facility's lacks any storm water retention capacity, and that as such, the Facility will discharge storm water during almost all QSEs.

**C.    The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

134.   Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

135.   Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

136.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the IGP.

**1.    Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

137.   Plaintiffs are informed, believe, and thereon allege the Facility has

discharged unauthorized non-storm water discharges ("NSWD") in violation of the IGP. *See* 2015 & 2020 Permit § III.B.

138.   On January 5, 2018, the City of Chula Vista issued a citation to the Facility for "[d]ischarge of sediment and sediment laden water into the City's storm water conveyance system" stemming from NSWDs. The citation specifically noted "[u]ncontained and excessive flow of mud from dust control from [an] on-site water truck," which caused the Facility to discharge "sediment and sediment laden water . . . into City's storm water conveyance system."

139.   A City of Chula Vista storm water quality inspection conducted on November 27, 2017 required the Facility to implement BMPs to prevent discharges from the Facility's irrigation system, indicating such unauthorized NSWDs are recurring.

140.   The 2015 SWPPP acknowledges the Facility may discharge non-storm water from vehicle or equipment rinse or wash operations, waste container drainages, pavement rinse or wash water, or floor rinse water. 2015 SWPPP § 3.1.7. While the SWPPP notes that any such waters are prohibited from entering a storm drain system, the MP-1 drainage inlet is located within DA-1, which is where the Facility's truck wash operations occur. *Id*. Table 6.2. The SWPPP fails to identify any specific BMPs that would prevent any of the aforementioned sources of NSWDs from entering the storm water drainage system, or from commingling with storm water at the Facility.

141.   Plaintiffs are informed, believe, and thereon allege Defendant has failed to develop and/or implement BMPs that would prevent NSWDs from comingling and/or discharging from the Facility in violation of the IGP.

142.   Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

143.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged and continues to discharge TSS and numerous other pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and

around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permit § III.C.

144.    The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

145.    "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

146.    The Facility's own storm water monitoring data demonstrates that on September 15, 2015, the Facility discharged extremely high levels of TSS in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, Facility's Monitoring Data.

147.    The City of Chula Vista citation dated January 5, 2018, specifically cited the Facility for "[d]ischarge of sediment and sediment laden water into the City's storm water conveyance system."

148.    The City of Chula Vista's November 27, 2017 inspection also indicated the Facility lacked adequate BMPs to control runoff associated with the Facility's outdoor storage of raw materials and tracking of dirt and mud from the Facility. The City of Chula Vista specifically directed the Facility to install a "containment berm or wall to prevent overflow of aggregate" onto adjacent property and into storm drain inlets outside the Facility's boundary, and "[i]mplement BMPs to prevent dirt and mud tracking."

149.    Plaintiffs are informed, believe, and thereon allege the Facility's discharges of polluted storm water have violated the IGP's Discharge Prohibition III.C.

150.    Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

151.    "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any

producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

152. Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

153. Plaintiffs are informed, believe, and thereon allege that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

154. Plaintiffs are informed, believe, and thereon allege the Facility Owner and/or Operator has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 Permits.

155. Plaintiffs are informed, believe, and thereon allege, based on Coastkeeper and CERF's review of available information including the Facility's own monitoring data, City of Chula Vista inspection and citation records, and direct observations, the Facility has discharged, and continues to discharge high concentrations of TSS in its storm water and non-storm water discharges.

156. The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Thus, Plaintiffs are informed, believe, and thereon allege the Facility's discharges of TSS in concentrations exceeding the Basin Plan Water Quality Objective violates Discharge Prohibition III.D.

157. Plaintiffs are informed, believe, and thereon allege that the Facility has discharged storm water with concentrations of several other pollutants in excess of the CTR standards and Basin Plan Water Quality Objectives in violation of the IGP.

158. Defendant's failures to collect storm water samples in accordance with the IGP and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

159. Each time the Facility discharges polluted storm water in violation of

Sections III.B, III.C, or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

160.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

### 2. Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

161.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permit § V.A.

162.   The Facility's own storm water monitoring data demonstrates that the Facility has discharged and continues to discharge high concentrations of TSS. *See* Ex. 1, Facility's Monitoring Data. For example, samples collected on September 15, 2015 showed TSS concentrations at 740 mg/L, and the Facility's most recent sample collected on February 12, 2021 showed TSS concentrations at 500 mg/L.

163.   City of Chula Vista records further indicate the Facility has failed to develop and implement BMPs that achieve BAT/BCT requirements. For example, the inspection on November 27, 2017, identified numerous deficiencies in the Facility's storm water BMPs. Chula Vista officials directed the Facility to take numerous corrective actions including: implementing a temporary berm or containment wall at the north side of the property to prevent the overflow of aggregate encroaching onto the Otay Landfill property and into an off-site storm drain inlet; providing a permanent solution to contain any overflow onto the Otay Landfill property within twenty-one days and to identify a time frame when this would be completed; stabilizing the lot area located by the scales and office trailer to prevent dirt tracking onto Energy Way; securing the fiber rolls around the site's storm drain inlets with either stakes or gravel bags; adding additional fiber rolls

on the south slope; and providing BMPs to prevent irrigation water from entering into the inlet located by the scale.

164. Visual observations conducted by Coastkeeper on January 29, 2021 confirm the Facility continues to lack BMPs that meet the BAT/BCT requirements of the IGP.

165. Each time Defendant discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

166. Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since March 25, 2016 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3. Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

167. Plaintiffs are informed, believe, and thereon allege that the Facility has violated and continues to violate IGP Receiving Water Limitations.

168. The Facility's own storm water monitoring data, the extensive gaps and shortcomings of the Facility's monitoring data, inspections and citations from the City of Chula Vista, and direct observations, indicate the Facility routinely discharges various aggregates, dirt, mud, sediment and/or sediment laden water, and other various other pollutants in excess of applicable Water Quality Standards.

169. Plaintiffs are informed, believe, and thereon allege the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality Objectives.

170. The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32. "Suspended and settleable solids are

deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

171.    High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability. *Id*. at 3-32. Agricultural supply is a designated beneficial use of the lower segment of the Otay River.

172.    Publicly available receiving water monitoring data indicates the Otay River is impaired for TDS, bacteria, nitrogen, and phosphorus. Thus, the Facility's polluted discharges cause and/or contribute to the Otay River's TDS impairment, and likely other pollutant the Facility has failed to analyze in its storm water samples.

173.    Because the Basin Plan is an applicable WQSs under the IGP, the Facility's ongoing storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

174.    Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants from the Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation VI.B of the 2015 and 2020 Permits.

175.    Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

176.    Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

177.    Plaintiffs are informed, believe, and thereon allege that the Facility has been

in violation since March 25, 2016 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

178.    Plaintiffs are informed, believe, and thereon allege that Defendant has conducted operations at the Facility with an inadequately developed and/or implemented SWPPP.

179.    Plaintiffs are informed, believe, and thereon allege the 2015 and 2021 SWPPPs lack an adequate pollutant source assessment.

180.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs that adequately: minimize the exposure of pollutants to storm water at the Facility; control and minimize polluted runoff from the Facility; treat and remove pollutants in storm water prior to discharge; prevent or control contaminated storm water from being discharged from the Facility; and prevent or control contaminated NSWDs from being discharged from the Facility.

181.    City of Chula Vista inspection records identified numerous deficiencies in the Facility's storm water BMPs. For example, on November 27, 2017, Chula Vista officials directed the Facility Owner and/or Operator to address numerous BMP deficiencies including containing and preventing the overflow of aggregate encroaching onto the Otay Landfill property and into an off-site storm drain inlet; stabilizing the lot area located by the scales and office trailer to prevent dirt tracking onto Energy Way; securing the fiber rolls around the site's storm drain inlets; adding additional fiber rolls on the south slope; and providing BMPs to prevent irrigation water from entering into the inlet located by the scale.

182.    Visual observations conducted by Coastkeeper on January 29, 2021 confirm the Facility continues to lack BMPs that comply with requirements of the IGP. Numerous fiber rolls were in disrepair and clearly ineffective, storm drain channels were full of debris, and numerous industrial materials and equipment were exposed to storm water

without BMPs implemented to minimize exposure or prevent the discharge of pollutants.

183.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP fails to adequately analyze the effectiveness of the Facility's existing BMPs.

184.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the Facility is in part a result of Defendant's failure to develop, implement, and revise an adequate SWPPP.

185.   Plaintiffs are informed, believe, and thereon allege the Facility's ongoing failures to implement adequate BMPs violates numerous provisions of the IGP's SWPPP requirements including, but not limited to, Sections X.H.1.a.ii, X.H.1.a.iv, and X.H.1.a.vii.

**E.      Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the Facility.**

186.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

187.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement a MIP that ensures the collection of storm water samples "from each drainage area at all discharge locations" in violation of Section XI.B.4 of the 2015 and 2020 Permits.

188.   While Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled, there is no indication the Facility Owner and/or Operator has complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

189.   The 2015 SWPPP and site map identify four drainage areas. However, the SWPPP only identifies three discharge locations and sampling points, specifically failing to account for the storm water discharge point from DA-3, the Facility's largest drainage area, which accounts for the majority of its industrial activities and materials.

190.   The Facility has failed to collect a single storm water sample from DA-3, in

1    violation of the IGP.

2        191.   Although the Facility's SWPPP and site map identify three separate

3    discharge and sampling points, the Facility has never collected samples from all three of

4    these discharge points in violation of the IGP.  For example, storm water samples

5    collected on September 15, 2015, December 16, 2016, and February 27, 2017 were taken

6    from only two locations, labeled "north" and "south." Storm water samples collected on

7    November 29, 2018, May 14, 2019, and November 8, 2020 were collected from only one

8    discharge point.

9        192.   Plaintiffs are informed, believe, and thereon allege Defendant failed and

10   continues to fail to collect the required number of storm water samples for each reporting

11   period.

12       193.   The Facility has failed collect the required four samples during each

13   reporting period since 2015. For example, the Facility failed to collect any samples

14   during the 2019–2020 or 2017–2018 reporting periods, collected only one sample during

15   the 2015–2016 reporting period, and collected only two samples during each of the

16   2016–2017 and 2018–2019 reporting periods. *See* Ex. 1, Facility's Monitoring Data.

17       194.   Numerous QSEs occurred during each reporting period. *See* Ex. 1,

18   Precipitation Data.

19       195.   The Facility lacks any storm water retention capacity.

20       196.   Plaintiffs are informed, believe, and thereon allege the Facility discharges

21   storm water from each drainage area during each QSE. Thus, Defendant's failure to

22   collect four samples during each reporting period, from each of the Facility's discharge

23   points, violates the IGP.

24       197.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and

25   continues to fail to sample and analyze storm water discharges for all parameters required

26   by the IGP.

27       198.   The Facility analyzes its storm water samples for only TSS, O&G, pH, and

28   iron.

199. As discussed *supra*, SIC code 5093 applies to the Facility because it is "primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[3] According to the 2015 SWPPP, the Facility "recycles used concrete and asphalt from the industrial process," and thus fits squarely within this category. *See* 2015 SWPPP § 3.1.4.

200. The IGP requires Facility's categorized under SIC code 5093 to analyze all storm water samples for iron, lead, aluminum, zinc, and COD. 2015 & 2020 Permits, Table 1. The Facility has failed to sample for any of these parameters in violation of the IGP.

201. The 2021 SWPPP's MIP indicates the Facility will analyze samples for iron. However, to date, the Facility has never sampled for iron.

202. Plaintiffs are informed, believe, and thereon allege the Facility does not comply with Sections XI.B.6.c–d of the 2015 and 2020 Permits, which requires permittees to analyze samples for all pollutants associated with the Discharger's industrial activities.

203. The 2015 and 2020 Permits require Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. *Id*. § XI.B.6.c.

204. As discussed in Section V.A, *supra*, the Facility's pollutant source assessment is deficient and in violation of the Permit as numerous pollutants such as TSS, pH, COD, lead, iron, zinc, BOD, aluminum, arsenic, cadmium, chromium, benzene, O&G, TDS, nitrogen, and phosphorus are likely present at the Facility and associated with its industrial activities. As a result, Defendant's failure to analyze samples for these

---

[3] NAICS Association, *Industry: 5093—Scrap and Waste Materials*, https://www.naics.com/sic-industry-description/?code=5093#:~:text=Establishments%20primarily%20engaged%20in%20assembling,in%20dismantling%20automobiles%20for%20scrap (last visited Mar. 22, 2021).

1  parameters violates the IGP.

2      205.    Plaintiffs are informed, believe, and thereon allege the Facility Owner and/or

3  Operator failed to comply with the Permit's requirements for sample holding times and

4  sample handling procedures in violation of the IGP, rendering almost all of the Facility's

5  sampling data invalid.

6      206.    Not a single sample collected by the Facility was received by the laboratory

7  within 48 hours, as required by Section XI.B.8 of the 2015 and 2020 Permits. *See also*

8  2015 & 2020 Permits Attachment H, ¶ 2. For example, the sample collected November 8,

9  2020, was not received by the lab until November 17, 2020.

10     207.    The Facility Owner and/or Operator also failed to comply with the Permit's

11 requirements for sample holding times for approved test methods. *See* 2015 & 2020

12 Permits § XI.B.10.

13     208.    All but one of the Facility's samples exceeded the holding time of seven

14 days for the approved test method for TSS (SM 2450-D), primarily because the Facility

15 failed to deliver the samples to the lab for analysis within the required time frame. *See* 40

16 C.F.R. § 136.3.

17     209.    Many of the Facility's samples also exceeded the holding time for the

18 approved test method for O&G (EPA 1664A) of twenty-eight days. For example, samples

19 collected on December 16, 2016 were not received by the lab until February 16, 2017,

20 two months later.

21     210.    The IGP requires dischargers to conduct visual observations of storm water

22 discharges, of authorized and unauthorized NSWDs, and of BMPs.

23     211.    Based on documentation from the City of Chula Vista, direct observations,

24 the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and

25 Receiving Water Limitations, and the Facility's failure to collect the required number of

26 storm water samples, Plaintiffs are informed, believe, and thereon allege the Facility

27 Owner and/or Operator fails to consistently, and/or adequately, conduct the required

28 discharge observations and monitoring of BMPs.

**F.     Defendant Has Violated the IGP's Reporting Requirements.**

212.   The 2015 Permit requires Permittees to submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event. 2015 & 2020 Permits § XI.B.11.a.

213.   Plaintiffs are informed, believe, and thereon allege Defendant failed to comply with these reporting requirements. For example, Facility Owner and/or Operator uploaded storm water sampling lab reports dated February 27, 2017 and March 21, 2017, to the SMARTS database on June 26, 2017, well over thirty days after they were received from the lab.

214.   The Facility Owner and/or Operator failed to submit an annual report for each reporting period until 2019–2020.

215.   Plaintiffs are informed, believe, and thereon allege Defendant has failed to submit Annual Reports that comply with the IGP reporting requirements. *See* 2015 & 2020 Permits § XVI.

216.   In each Annual Report, Defendant must certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

217.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the IGP, and thus Defendant's certification to the 2019–2020 is erroneous, and constitutes a violation of the IGP and CWA.

**G.     Defendant Has Violated the IGP's ERA Provisions.**

218.   Plaintiffs are informed, believe, and thereon allege Defendant has failed to comply with several of the IGP's ERA requirements.

219.   The Facility's storm water monitoring data from the 2015–16 reporting period shows the Facility exceeded the applicable NALs for TSS and O&G. As such, the Facility entered Level 1 status for the aforementioned parameters on July 1, 2016.

220.   Defendant submitted a Level 1 ERA Report on March 13, 2017, which is

publicly available on the SMARTS database.

221.   Plaintiffs are informed, believe, and thereon allege Defendant failed to complete a Level 1 ERA evaluation by October 1, 2016, in violation of Section XII.C.1 of the IGP.

222.   Plaintiffs are informed, believe, and thereon allege Defendant failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017, in violation of Section XII.C.2 of the IGP.

223.   Plaintiffs are informed, believe, and thereon allege the Facility's Level 1 ERA Report is also factually inaccurate.

224.   The Level 1 ERA Report itself acknowledges that the Facility was required to submit a Level 1 Report because the Facility failed to submit its monitoring data to SMARTS.

225.   While the Defendant did fail to timely submit such monitoring data, the Facility entered Level 1 status due to discharging extremely high concentrations of TSS and O&G, as evidenced by the Facility's own sampling data collected on September 15, 2015, and uploaded to SMARTS on November 13, 2015.

226.   The Facility's Level 1 ERA Report fails to acknowledge any sampling data or NALs exceedances, and as such fails to comply with the Level 1 ERA requirements of the IGP.

227.   Additionally, as discussed extensively *supra*, City of Chula Vista inspection documents and Coastkeeper's direct observations indicate the Facility failed to develop and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c. Coastkeeper and CERF note, as has also been discussed *supra*, the Facility's sampling data is largely invalid, incomplete, and fails to reflect the actual quality of the Facility's storm water and non-storm water discharges. Thus, a lack of recent NALs exceedances in the Facility's sampling data has little bearing on the efficacy of the Facility's BMPs, or the quality of

its storm water discharges.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

228.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

229.   Plaintiffs are informed and believe, and thereon allege that prohibited non-storm water discharges have and continue to discharge from the Facility. Defendant's ongoing failure to prevent unauthorized non-storm water discharges is a violation of the IGP and the CWA. 2015 & 2020 Permit § III.B; 33 U.S.C. § 1311(a).

230.   Defendant violated and will continue to violate the IGP Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

231.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the 2015 and 2020 Permits.

232.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the 2015 and 2020 Permits.

233.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibition at the Facility every day from March 25, 2016 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

234.   Each and every violation of the IGP Discharge Prohibitions is a separate and

distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 25, 2016 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

235. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

236. Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

237. Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

238. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 Permit § I.D.32, V.A; 2020 Permit § V.A; *see also* 33 U.S.C. § 1311(b).

239. Defendant violated and continues to violate the IGP Effluent Limitation each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

240. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitation at the Facility every day from March 25, 2016, to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitation and the CWA are ongoing and continuous.

Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

241.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

242.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 25, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## THIRD CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

243.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

244.   Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

245.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

246.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permit § X; *see also* 33 U.S.C. § 1311(b).

247.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from March 25, 2016 to the present. Defendant's violations of the IGP

SWPPP requirements and the CWA at the Facility are ongoing and continuous.

248.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

249.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since March 25, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

250.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

251.   Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

252.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § B; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

253.   Defendant has been in violation of the IGP MIP requirements every day from March 25, 2016, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

254.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

255.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions

alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 25, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

### FIFTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

256.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

257.    Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

258.    The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

259.    Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least March 25, 2016. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

260.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

261.    Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 25, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

/././

/././

/././

## SIXTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

262.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

263.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility. Defendant's failure to conduct the requisite visual observations at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

264.    Defendant has failed to collect and analyze the required number of storm water samples the Facility. Defendant's failure to collect and analyze the required number of storm water samples at the Facility is a violation of the IGP and the CWA. 1997 Permit §§ B.5.a–b, 2015 Permit & 2020 Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

265.    Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

266.    Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since March 25, 2016. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

267.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

268.    Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since March 25, 2016. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

### SEVENTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

269.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

270.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to conduct adequate Level 1 status evaluations for multiple pollutants at the Facility in violation of the IGP.

271.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator has failed and continues to fail to submit adequate Level 1 ERA Reports for multiple pollutants at the Facility in violation of the IGP.

272.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator conducts operations at the Facility each day without conducting an adequate Level 1 Evaluation and/or without submitting an adequate Level 1 ERA Report in violation of the IGP. *See* 2015 & 2020 Permit § XII.C.

273.   The Facility Owner and/or Operator will continue to be in violation of the IGP and the CWA each and every day the Facility Owner and/or Operator fails to comply with the Level 1 ERA requirements at the Facility.

274.   Plaintiffs are informed and believe, and thereon allege that the Facility Owner and/or Operator's violations of the Level 1 requirements of the IGP and the CWA are ongoing and continuous.

275.   Every day the Facility Owner and/or Operator conducts operations at the Facility without conducting an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Report, is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

276.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP's Level 1 status ERA evaluation requirement every day since

October 21, 2016.

277.   The Facility Owner and/or Operator has been in daily and continuous violation of the IGP for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017.

278.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the Level 1 status Evaluation requirements occurring from October 21, 2016, to the present, and for each and every violation of the Level 1 ERA Report requirements occurring from January 1, 2017, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. § 1319(d), 1365; 40 C.F.R. § 19.4.

279.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

280.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendant as set forth hereafter

## VI.   **RELIEF REQUESTED**

281.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.      A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.      A court order assessing civil monetary penalties for each violation of the CWA at $56,460.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

e.      A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: June 21, 2021

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org