# Exhibit "1"

 

March 26, 2021

<u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Reclaimed Aggregates                    Steven James Concannon
Pavement Recycling Systems              Agent for Service of Process
ATTN: Managing Agent                    Pavement Recycling Systems, Inc.
855 Energy Way                          10240 San Sevaine Way
Chula Vista, California 91911           Jurupa Valley, California 91752

Donald Matthews
Agent for Service of Process
Reclaimed Aggregates, Inc.
10240 San Sevaine Way
Jurupa Valley, California 91752

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To the Above-Listed Recipients:

Please accept this letter on behalf of San Diego Coastkeeper ("Coastkeeper") and Coastal Environmental Rights Foundation ("CERF") regarding violations of the Clean Water Act[1] and California's General Permit for Storm Water Discharges Associated with Industrial Activities[2] (hereinafter "Industrial General Permit"), occurring at the Reclaimed Aggregates, Inc. facility located at 855 Energy Way, Chula Vista, California 91911 (hereinafter "Facility" or "Reclaimed Aggregates Facility"). The purpose of this letter is to put Reclaimed Aggregates, Inc. ("Reclaimed Aggregates") and/or Pavement Recycling Systems, Inc. ("Pavement Recycling Systems"), as the owner(s) and/or operator(s) of the Facility, on notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Industrial General Permit are violations of the Clean Water Act. As explained below, Reclaimed Aggregates and/or Pavement Recycling Systems are liable for violations of the Industrial General Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ ("1997 Permit"), and Order No. 2014-0057-DWQ ("2015 Permit") as amended in 2015 and 2018.

control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This notice letter ("Notice Letter") is being sent to you as the responsible Owners and/or Operators of the Facility, or as the registered agent for the Owners and/or Operators. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Facility Owners and/or Operators that Coastkeeper and CERF intend to file a federal enforcement action against Reclaimed Aggregates and/or Pavement Recycling Systems for violations of the Industrial General Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

## 1.   BACKGROUND

### 1.1. <u>San Diego Coastkeeper and Coastal Environmental Rights Foundation</u>.

San Diego Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3900 Cleveland Avenue, Suite 102, San Diego, California 92103. Founded in 1995, San Diego Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of San Diego County watersheds. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, California. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. CERF's mailing address is 1140 S. Coast Highway 101, Encinitas, California 92024.

Members of Coastkeeper and CERF live, work, recreate, and/or otherwise use and enjoy the areas in and around the waters into which the Facility discharges, including the Otay River, San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters"). Members of Coastkeeper and CERF use the Receiving Waters to swim, boat, kayak, surf, bird watch, view wildlife, fish, hike, bike, walk, run, for general aesthetic enjoyment, and/or for educational opportunities or developing educational tools. Additionally, members of Coastkeeper and CERF use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The discharges of pollutants from the Facility impair each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's and CERF's members have been, are being, and will continue to be adversely affected by the Facility Owners and/or Operators' failure to comply with the Clean Water Act and the Industrial General Permit.

### 1.2. <u>The Owners and/or Operators of the Facility</u>.

Information available to Coastkeeper and CERF indicates that Reclaimed Aggregates and/or Pavement Recycling Systems is/are the Owner(s) and/or Operator(s) of the Facility located at 855 Energy Way, Chula Vista, California 91911. Certain classified facilities that

discharge storm water associated with industrial activity are required to submit a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Industrial General Permit coverage.[3] The Facility submitted its most recent NOI on September 23, 2020 ("2020 NOI"), which is publicly available via the Storm Water Multiple Application & Reporting Tracking System ("SMARTS") database. The 2020 NOI indicates the site name is "Reclaimed Aggregates," and the Facility Operator is "Pavement Recycling Systems Inc" located at 10240 San Sevaine Way, Jurupa Valley, California 91752. The Facility's Storm Water Pollution Prevention Plan ("SWPPP"), dated June 10, 2015 ("2015 SWPPP"), refers to the Facility as "Pavement Recycling Systems/Reclaimed Aggregates Inc.," and was prepared for "Pavement Recycling Systems, Inc.," located at 10240 San Sevaine Way, Jurupa Valley, California 91752. Pavement Recycling Systems, Inc., located at 10240 San Sevaine Way, is an active California Corporation, entity number C1459029. Reclaimed Aggregates, Inc., also located at 10240 San Sevaine Way, is an active Nevada Corporation, operating in California under entity number C2658445.

The Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Industrial General Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters. As explained herein, the Facility Owners and/or Operators are liable for violations of the Industrial General Permit and the Clean Water Act.

### 1.3. The Facility's Industrial General Permit Coverage.

Information available to Coastkeeper and CERF indicates the Facility first obtained Industrial General Permit coverage on August 3, 2009, under Waste Discharge Identification ("WDID") number as 9 37I022251. According to the 2015 SWPPP, the Facility encompasses six acres, approximately thirty percent of which are covered by asphalt paving or cement surfaces, all of which is used for industrial activities and directly exposed to precipitation and stormwater runoff. The Facility's 2020 NOI states the Facility is five acres, all of which are industrial area exposed to storm water, and that the Facility is ten percent impervious.

Both the 2015 SWPPP and 2020 NOI list the Facility's Standard Industrial Classification ("SIC") code as 3241 (Cement, Hydraulic). However, as stated in 2015 SWPPP, SIC code 3241 "is for establishments primarily engaged in manufacturing hydraulic cement, including portland, natural, masonry, and pozzolana cements," which does not describe the type of industrial activities conducted at the Reclaimed Aggregates Facility. 2015 SWPPP § 2.1.1. Information available to Coastkeeper and CERF indicates that SIC codes 5093 (Scrap and Waste Materials), 3727 (Concrete Products, except Block and Brick), and 5032 (Brick, Stone, and Related Construction Materials) apply to the Facility. SIC code 5093 applies to "[e]stablishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[4] According to the 2015 SWPPP, the Facility "recycles used concrete and

---

[3] *See* 2015 and 2020 Permits, Attachment A.
[4] NAICS Assocaition, SIC Industry Description, Industry: 5093—Scrap and Waste Materials, https://www.naics.com/sic-industry-

asphalt from the industrial process." 2015 SWPPP § 3.1.4. Once waste concrete is reconstituted into a reusable product, SIC code 3727 applies. The 2015 SWPPP acknowledges that Reclaimed Aggregates sells materials after they are processed. *Id.* § 3.1.3. Information available to Coastkeeper and CERF, including direct observations, photographs, and publicly available images, indicate that SIC code 5032 also applies as there are large stockpiles of various aggregates processed and/or sold at the Facility. SIC codes 5093 and 3727 require coverage under the Industrial General Permit. 2015 & 2020 Permits, Attachment A.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that industrial activities are conducted throughout the Facility, and thus the entire Facility requires Industrial General Permit coverage. As noted in the Facility SWPPP, all of the Facility's acreage "is used for industrial activities and are directly exposed to precipitation and stormwater runoff." 2015 SWPPP § 2.3. In addition, the Industrial General Permit's definition of "storm water associated with industrial activities," as well as the Permit's explanation of material handling activities, requires Permit coverage for any potential non-industrial sources that comingles with industrial storm water or non-storm water. Because the Facility lacks best management practices ("BMPs") or other controls to separate industrial storm water flows from portions of the Facility where non-regulated activities may occur, this water commingles, and thus all storm water and non-storm water discharges from the Facility require coverage under the Industrial General Permit.

### 1.4. <u>Storm Water Pollution and the Receiving Waters</u>.

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations around San Diego County, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Information available to Coastkeeper and CERF indicate the Facility has discharged and continues to discharge storm water and non-storm water with excessive concentrations of sediments and other pollutants that are associated with its industrial activities. According to the 2015 SWPPP, storm water from the Facility flows into a collection system that flows beneath the Facility, under Energy Way, commingles with runoff from other nearby facilities via various open channels and underground systems, and ultimately discharges to the Otay River, approximately 1,500 feet away from the Facility. 2015 SWPPP § 2.1. The Otay River flows westward and discharges into the south end of San Diego Bay, and eventually the Pacific Ocean.

The Receiving Waters into which the Facility discharges polluted storm water are ecologically sensitive areas. The Otay River and portions of San Diego Bay provide critical migrating waterfowl habitat, nesting sites for sensitive bird species, and generally protect a

description/?code=5093#:~:text=Establishments%20primarily%20engaged%20in%20assembling ,in%20dismantling%20automobiles%20for%20scrap.

tremendous diversity of plant and animal species. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, the Receiving Waters are still essential habitat for dozens of fish, bird, mammal, and reptile species. For example, the Otay River Valley is home to coyotes, grey foxes, raccoons, desert cottontails, and American badgers. According to the City of Chula Vista, over 200 bird species utilize the Otay River Valley including the great blue heron, snowy egret, white-tailed kite, northern harrier, red-tailed hawk, coots, ducks, and endangered birds such as Least Bell's Vireo and southwestern willow flycatcher.[5] Pollutants discharged from the Facility are deleterious to invertebrates, insects, larval fish, and local vegetation in the Otay River and Otay River Valley. As such, these pollutant discharges strain the ecosystems on which numerous species, some of which are endangered, depend for survival.

Furthermore, the Otay River empties directly into the San Diego Bay National Wildlife Refuge, a 2,300-acre protected refuge managed by the U.S. National Fish and Wildlife Service at the southern end of San Diego Bay.[6] As over ninety percent of the historic wetlands of San Diego Bay have been filled in, drained, or diked, this refuge provides critical habitat for hundreds of thousands of birds migrating along the Pacific Flyway, as well as for the bay's resident species. Storm water and non-storm water contaminated with sediment and other pollutants degrade San Diego Bay, and in particular the special biological significance of the National Wildlife Refuge.

The polluted discharges from the Facility harm the special aesthetic and recreational significance of the Receiving Waters, adversely impacting the public's ability, as well as that of Coastkeeper's and CERF's members, to use and enjoy these unique waterbodies. Otay Valley Regional Park extends from the mouth of the Otay River at San Diego Bay, along the Otay River to the Lower Otay Reservoir. The park includes several miles of hiking, biking, and equestrian riding along the Otay River, which offer recreational opportunities to observe wildlife in unique habitats such as maritime succulent scrub, southern cottonwood willow riparian forest, alkali marsh, Diegan coastal sage scrub.[7] The San Diego Bay National Wildlife Refuge is also easily accessible by the public for use and enjoyment. The wildlife refuge recently completed a new pedestrian trail for birding and wildlife viewing as well as "interpretive panels to enhance visitors' experience on the trail with information related to migratory birds, [and] salt marsh restoration."[8] Pollutants discharged from the Facility affects the health of the Receiving Waters, and thus the plant and animal life of the surrounding habitats. Damage to these natural habitats, and thus the flora and fauna within them, harms the ability of the public, including Coastkeeper's and CERF's members' ability to use and enjoy the unique recreational opportunities offered by

---

[5] Otay Valley Regional Park Brochure,
https://www.chulavistaca.gov/home/showdocument?id=8405.
[6] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *About the Refuge*,
https://www.fws.gov/refuge/San_Diego_Bay/about.html.
[7] Otay Valley Regional Park Brochure.
[8] U.S. Fish & Wildlife Service, San Diego Bay National Wildlife Refuge, *New Bayside Birding & Walking Trail Provides Enhanced Access to San Diego Bay NWR*,
https://www.fws.gov/refuge/san_diego_bay/New_Birding_Trail.aspx.

the Receiving Waters. Furthermore, Coastkeeper's and CERF's members are less likely to recreate in and around waters known to be polluted.

The California Regional Water Quality Control Board, San Diego Region, ("Regional Board") issued the *Water Quality Control Plan for the San Diego Basin* ("San Diego Basin Plan" or "Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Otay River include: non-contact water recreation; warm freshwater habitat; wildlife habitat; rare, threatened, or endangered species; and the potential beneficial use of contact recreation. Basin Plan, Table 2-2. The existing Beneficial Uses for the San Diego Bay include: contact recreation; non-contact water recreation; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; migration of aquatic organisms; marine habitat; estuarine habitat; spawning, reproduction, and/or early development; shellfish harvesting; commercial and sport fishing; navigation; and industrial service supply. *Id*. at Table 2-3.

According to the 2016 303(d) List of Impaired Water Bodies, San Diego Bay is impaired for mercury, polycyclic aromatic hydrocarbons ("PAHs"), and polychlorinated biphenyls ("PCBs").[9] Other parts of San Diego Bay are impaired for benthic community effects, sediment toxicity, copper, total coliform, enterococcus, fecal coliform, and chlordane. Information available to Coastkeeper and CERF, including Coastkeeper's monitoring data reported in the California Environmental Data Exchange Network ("CEDEN"), confirms that the Otay River is impaired for indicator bacteria such as e. Coli and enterococcus, nutrients such as Nitrate + Nitrite ("N+N") and phosphorus, and total dissolved solids ("TDS").[10]

## 2.   THE FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1.   The Facility Site Description and Industrial Activities.

The Reclaimed Aggregates Facility is located at 855 Energy Way in Chula Vista, California. It is bordered by the Otay Landfill to the north, a salvage yard to the west, a trucking company and a waste hauling vehicle maintenance facility to the east, and Energy Way to the South. 2015 SWPPP § 2.1.

According to the 2015 SWPPP, the Facility "recycles used concrete and asphalt from the industrial process." *Id*. § 3.1.4. The Facility obtains used asphalt, concrete, and other road-base materials from various industrial processes. *Id*. §§ 2.1.1., 3.1.3, 3.1.4. The Facility then crushes, screens, and otherwise reconstitutes the materials into grindings, base materials, and other reusable products it then sells for reuse. *Id*. § 3.1.3. According to various City of Chula Vista

---

[9] 2016 Integrated Report – All Assessed Waters, *https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml*.
[10] This data and information is publicly available at https://ceden.waterboards.ca.gov/AdvancedQueryTool under the program titled "SDCK Monitoring Program."

inspection reports, the Facility's principle industrial activities include construction recycling, and crushing and aggregate recycling.

According to the Facility SWPPP, industrial activities conducted at the Facility include loading, unloading, and moving used materials and processed materials around the site; crushing, screening, and otherwise processing used materials for reuse; storage of used and processed materials; and various vehicle and equipment maintenance activities conducted throughout the site.

Certain areas of the Facility are designated for specific industrial activities including material handling and storage areas, staging areas, daily production areas, aggregate stockpile areas, a mobile office, vehicle and equipment parking areas, waste storage areas, chemical storage areas, and two concrete-lined and bermed containment areas. *Id*. § 2.1.1. Bulk materials such as used asphalt and concrete are stored throughout the site. *Id*. § 3.1.3. Industrial equipment used at the Facility includes front end loaders, a truck scale, trucks, trailers, water tanks, above-ground diesel storage tanks, a propane tank, a drum storage container, and electrically-powered crushing and screening equipment. *Id*. § 2.1.1.

According to the Facility SWPPP, industrial materials used and stored at the Facility include used and processed asphalt, concrete, and other road-base industrial materials; various cleaners, solvents, coolants, anti-freeze, and lubricants used for maintenance; hydraulic fuels and oil; gasoline and diesel fuel; and various chemicals.

## 2.2. **Pollutants and Pollutant Sources Related to the Facility's Industrial Activities.**

Despite the industrial activities conducted and materials handled at the Facility, the 2015 SWPPP fails to adequately describe and assess all potential pollutant sources, and types of pollutants present at the Facility. According to the SWPPP's pollutant source assessment, the only activities and associated materials that could potentially contribute pollutants to stormwater runoff consist of hydraulic fluids, oils, gasoline, diesel fuel, anti-freeze/coolant, and used oil. 2015 SWPPP § 3.2.1. Further, the Facility's table of potential pollutant sources and list of associated BMPs identifies and assesses only pollutants related to vehicle and equipment maintenance, and spills and leaks "inside buildings" of materials such as coolants, hydraulic fluids, and oils. 2015 SWPPP, Table 4-6. Other sections of the Facility SWPPP acknowledge that the massive quantities of asphaltic and concrete-based grindings and/or road-base materials, storage of such grindings and materials, various outdoor equipment storage, and general waste storage areas, may affect the quality of the Facility's storm water discharges. 2015 SWPPP §§ 2.1, 3.1.1. Thus, the SWPPP fails to assess pollutant contributions of the primary industrial operations conducted at the Facility including loading, unloading, processing, screening, and storing waste asphalt, concrete, and other waste base road materials for recycled use, which likely pose the largest threat to the Facility's storm water discharges. The SWPPP also fails to assess which pollutants are associated with these industrial activities and materials.

City of Chula Vista inspection documents indicate the Facility's storm water and non-storm water discharges include pollutants such as aggregates into off-site storm drain inlets,

tracking of dirt onto Energy Way, sediment and sediment laden water into City of Chula Vista storm water conveyance systems, uncontained and excessive flow of mud from dust control watering, and runoff from excessive irrigation.

The Facility only analyzes its storm water samples for the minimum parameters of total suspended solids ("TSS"), oil and grease ("O&G"), and pH. However, as discussed in Section 1.3, *supra*, SIC Code 5093 applies to the Facility's industrial operations. The Industrial General Permit requires SIC Code 5093 facilities to analyze all collected storm water samples for iron, lead, aluminum, zinc, and chemical oxygen demand ("COD"), as these pollutants are commonly present in such operations. 2015 & 2020 Permits § XI.B.6.d.

The EPA Industrial Stormwater Fact Sheet for Sector E industrial activities further indicates that pollutants associated with the Facility's industrial activities and materials include TSS, pH, COD, lead, iron, zinc, biological oxygen demand ("BOD"), aluminum, arsenic, cadmium, chromium, benzene, and O&G.[11] Information available to Coastkeeper and CERF, including Coastkeeper and CERF's experience engaging with facilities with similar industrial activities and industrial materials, indicates that the Facility has a high potential to discharge TDS, nitrogen, and phosphorus in its stormwater and non-stormwater discharges. As discussed in Sections 3.4 and 3.5, *infra*, the Facility Owners and/or Operators have failed to assess any of these pollutants, and to analyze its storm water samples for any of these pollutants, in violation of the Industrial General Permit.

Information available to Coastkeeper and CERF indicates that many of the aforementioned industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility. Further, many pollutants associated with industrial activities regularly escape via wind dispersion, track out, or otherwise, resulting in pollutant dispersal throughout the Facility. Information available to Coastkeeper and CERF indicates the pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles, foot traffic, and dispersed via wind and storm water throughout the entire site, and on and off the Facility through ingress and egress. This results in employees and vehicles tracking pollutants off-site. The resulting illegal discharges of polluted storm water and non-storm water impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human wellbeing, aquatic life, and ecosystem health.

---

[11] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector E: Glass, clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities* (Feb. 2021), https://www.epa.gov/sites/production/files/2015-10/documents/sector_e_glass.pdf.

### 2.3. <u>Facility Storm Water Flow and Discharge Locations</u>

According to the Facility SWPPP, all of the Facility's acreage is used for industrial activities and is directly exposed to precipitation and stormwater runoff. *Id.* § 2.3. The majority of the Facility's acreage lies within a depression sloping into the site approximately 30 to 50 feet below the roadway elevation of Energy Way. Surface drainage at the site currently flows to the middle of the site. Stormwater is conveyed through surface sheet flow and internal catch basins. § 2.3.1.

The Facility SWPPP indicates the Facility is composed of four drainage areas, DA-1 through DA-4. 2015 SWPPP § 2.3.1. DA-1 is located on the western side of the Facility and primarily used for truck washing activities. DA-2, located on the southwestern portion of the site, encompasses the driveway and "a small portion of working area." According to the Facility site map, DA-3 encompasses most of the site, and is where the numerous industrial activities such as material loading, unloading, storage and stockpiling, and processing occurs. DA-4 is located in the southern portion of the site and includes an elevated work pad area. While the 2015 SWPPP states that that site map "shows the area layout, including the general site drainage, run-on locations, drainage inlets, approximate drainage areas, and discharge locations," the site map only provides a delineation of the Facility's drainage areas and no other information.

According to the 2015 SWPPP, "[t]he interior of the site includes three drain inlets: two drop inlets and a swale discharging to a pipe inlet tied to the central drop inlet structure." § 2.1. The northern border of the facility is adjacent to an offsite drain inlet generally associated with runoff from the landfill's paved roadway. The SWPPP acknowledges three monitoring sites, presumably associated with these three drain inlets: MP-1 located at the end of truck wash area in DA-1; MP-2 located near the driveway in DA-2; and MP-3 in the southern portion of the site on the elevated work pad in DA-4. No drainage inlet or monitoring location is designated within DA-3, which is the largest drainage area, and accounts for the vast majority of industrial operations within the site.

According to the 2015 SWPPP, storm water enters the Facility's various inlets, flows into a subsurface storm water collection system, beneath the Facility, under Energy Way and other facilities, and ultimately discharges into the Otay River, approximately 1,500 feet south of the Facility. *Id.* The Otay River flows westward and discharges into the south end of San Diego Bay, and eventually the Pacific Ocean.

## 3. VIOLATIONS OF THE CLEAN WATER ACT AND THE INDUSTRIAL GENERAL PERMIT

In California, any person who discharges storm water associated with certain industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge pollutants. *See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Industrial General Permit was reissued, which Coastkeeper and CERF refer to as the "2015 Permit." On July 1, 2020,

pursuant to Order 2014-0057-DWQ as amended in 2015 and 2018 ("2020 Permit"), the reissued 2020 Industrial General Permit took effect. As explained below, the 2020 Permit includes terms that are as stringent or more stringent than the 2015 Permit. Accordingly, the Facility Owners and/or Operators are liable for violations of the 2015 Permit and ongoing violations of the 2020 Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480–81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853–54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121–22 (D.N.J. 1988) ("[l]imitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

### 3.1. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Discharge Prohibitions.</u>

The Industrial General Permit contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permits § III.A. The Discharge Prohibitions provisions prohibit the direct or indirect discharge of liquids or materials other than storm water non-storm water discharges ("NSWDs"), which are not otherwise authorized by a NPDES permit, to the waters of the United States. 2015 & 2020 Permits § III.B. "Measures to control sources of unauthorized NSWDs such as spills, leakage, and dumping, must be addressed through the implementation of Best Management Practices (BMPs)." 2015 & 2020 Permit § I.C.28.

These provisions further prohibit storm water discharges and authorized NSWDs which cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the California Water Code. 2015 & 2020 Permits § III.C. The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease." "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

Information available to Coastkeeper and CERF indicates the Facility has repeatedly discharged unauthorized NSWDs in violation of the Industrial General Permit. For example, on January 5, 2018, the City of Chula Vista issued a citation to the Facility for "[d]ischarge of sediment and sediment laden water into the City's storm water conveyance system" stemming from NSWDs. The citation specifically noted "[u]ncontained and excessive flow of mud from dust control from [an] on-site water truck," which caused the Facility to discharge "sediment and sediment laden water . . . into City's storm water conveyance system." A storm water quality inspection conducted by the City of Chula Vista conducted on November 27, 2017 also required the Facility to implement BMPs to prevent discharges from the Facility's irrigation system, indicating such unauthorized NSWDs are recurring. Additionally, the 2015 SWPPP

acknowledges the Facility may discharge non-storm water from vehicle or equipment rinse or wash operations, waste container drainages, pavement rinse or wash water, or floor rinse water. 2015 SWPPP § 3.1.7. While the SWPPP notes that any such waters are prohibited from entering a storm drain system, the MP-1 drainage inlet is located within DA-1, which is where the Facility's truck wash operations occur. *Id.* Table 6.2. Furthermore, the SWPPP fails to identify any specific BMPs that would prevent any of the aforementioned sources of NSWDs from entering the storm water drainage system, or from commingling with storm water at the Facility. The SWPPP also acknowledges that dust control is "necessary" at the Facility, but fails to describe how the Facility conducts such dust control measures, and whether any BMPs are implemented to prevent dust control water from discharging or commingling with storm water. While the SWPPP claims that "dust control water" is an authorized NSWD under the Industrial General Permit, this is erroneous as the Permit does not authorize any NSWDs for water used for dust control. *See* 2020 Permit § IV.A. As such, the Facility Owners and/or Operators have illegally discharged non storm water, and failed to develop and/or implement BMPs that would prevent these NSWDs from comingling and/or discharging from the Facility in violation of the Industrial General Permit. *See* 2015 & 2020 Permits § III.B.

Information available to Coastkeeper and CERF indicates the Facility has discharged, and continues to discharge TSS and various other pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters. For example, the Facility's own storm water monitoring data demonstrates that on September 15, 2015, the Facility discharged extremely high levels of TSS in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, Facility's Monitoring Data. Further, as previously noted, the City of Chula Vista citation dated January 5, 2018, specifically cited the Facility for "[d]ischarge of sediment and sediment laden water into the City's storm water conveyance system." The City of Chula Vista's November 27, 2017 inspection also indicated the Facility lacked adequate BMPs to control runoff associated with the Facility's outdoor storage of raw materials and tracking of dirt and mud from the Facility. The City of Chula Vista specifically directed the Facility to install a "containment berm or wall to prevent overflow of aggregate" onto adjacent property and into storm drain inlets outside the Facility's boundary, and "[i]mplement BMPs to prevent dirt and mud tracking." On January 29, 2021, a Coastkeeper representative visually observed that the Facility still lacks adequate BMPs to control and prevent excessive sediment and aggregate concentrations in the Facility's storm water discharges. As further discussed in Section 3.5, *infra*, the Facility has failed to collect samples from all drainage areas, including those areas in which the Facility's most intensive industrial activities and materials are located. As such, much of the Facility's storm water monitoring data fails to accurately reflect the full extent of the Facility's pollutant load contributions. In light of the foregoing, the Facility's discharges of polluted storm water have violated the Industrial General Permit. *See* 2015 & 2020 Permits § III.C.

Section III.D of the 2015 and 2020 Permits states that "[d]ischarges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control Plans (Basin Plans), or statewide water quality control plans and policies are prohibited." The San Diego Basin Plan designates beneficial uses for water bodies in the San Diego region and

establishes water quality objectives and implementation plans to protect those beneficial uses.[12] The Basin Plan further establishes certain Waste Discharge Prohibitions.[13] Waste Discharge Prohibition number 5 of the Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited. Allowances for dilution may be made at the discretion of the Regional Board."[14] "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water.[15] Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the San Diego Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

Information available to Coastkeeper and CERF indicates that no express allowance for dilution has been granted by the Regional Board applicable to the Facility's discharges or to the downstream Receiving Waters. As such, and consistent with Coastkeeper and CERF's review of available information including the Facility's own monitoring data, City of Chula Vista inspection and citation records, and direct observations, the Facility Owners and/or Operators have violated and continue to violate Discharge Prohibition III.D of the 2015 and 2020 Permits by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the California Toxics Rule ("CTR").[16] For example, as previously discussed, plentiful evidence indicates the Facility has discharged, and continues to discharge high concentrations of TSS in its storm water and non-storm water discharges. The San Diego Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Thus, the Facility's discharges of TSS in concentrations exceeding the Basin Plan Water Quality Objective violates Discharge Prohibition III.D.

As discussed in Section 2.2, *supra*, and Section 3.5, *infra*, information available to Coastkeeper and CERF indicates that the Facility Owners and/or Operators have failed and continue to fail to analyze storm water discharges from the Facility for numerous additional pollutants that result from the Facility's industrial operations. As such, in addition to TSS, the Facility likely discharges many other pollutants in concentrations exceeding Basin Plan Water Quality Objectives and the CTR, in violation of Discharge Prohibition III.D.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Discharge Prohibitions are violated each time storm water discharges from the Facility. *See* Exhibit 2 (setting forth dates of all precipitation events during the past five

---

[12] *See* https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/ for updated Basin Plan.
[13] San Diego Basin Plan, Chapter 4, page 4-19.
[14] *Id*. at page 4-20 (Waste Discharge Prohibition 5).
[15] California Water Code, § 13050(d).
[16] 40 C.F.R. § 131.38.

Notice of Intent to Sue: Clean Water Act
*Reclaimed Aggregates, Inc.*
March 26, 2021
Page 13

years).[17] These Discharge Prohibition violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Discharge Prohibitions III.B, III.C, or III.D of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since March 26, 2016, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operator are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Discharge Prohibitions III.B, III.C, and III.D are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the Numeric Action Levels ("NALs") listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Discharge Prohibition provisions.

### 3.2. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Effluent Limitations.</u>

The Industrial General Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 2015 & 2020 Permits § V.A.

The EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation V.A of the 2015 and 2020 Permits.[18] As such, discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has

---

[17] Exhibit 2 includes the dates of all precipitation events recorded during the past five years, and the corresponding quantity of precipitation for each such event. The data in Exhibit 2 was recorded by the National Oceanic & Atmospheric Administration at the weather monitoring station geographically nearest to the Facility with complete precipitation records. Coastkeeper and CERF will include additional dates of rain events when that information becomes available.
[18] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009, Fact Sheet at 106; *see also* 65 Fed. Reg. 64839 (2000).

Notice of Intent to Sue: Clean Water Act
*Reclaimed Aggregates, Inc.*
March 26, 2021
Page 14

not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants.[19]

Information available to Coastkeeper and CERF indicates that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility. For example, the Facility's own storm water monitoring data demonstrates that on September 15, 2015 the Facility discharges concentrations of TSS as high as 740 mg/L, over seven times higher than the EPA Benchmark of 100 mg/L. However, the Facility's storm water monitoring results fail to accurately reflect the full extent of the Facility's pollutant load contributions as the Facility routinely fails to collect storm water from all of the Facility's drainage areas, including those areas in which the Facility's most intensive industrial activities and materials are located.

As discussed in Section 2.2, *supra*, and Section 3.5, *infra*, information available to Coastkeeper and CERF indicates that the Facility Owners and/or Operators have failed and continue to fail to analyze storm water discharged from the Facility for numerous additional pollutants that result from the Facility's industrial operations. As such, in addition to TSS and O&G, the Facility likely discharges many other pollutants in concentrations exceeding EPA benchmarks, indicating that the Facility has failed to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards.

City of Chula Vista records further indicate the Facility has failed to develop and implement BMPs that achieve BAT/BCT requirements. For example, a storm water quality inspection conducted on November 27, 2017, identified numerous deficiencies in the Facility's storm water BMPs. Chula Vista officials directed the Facility Owners and/or Operators to take numerous corrective actions including implementing a temporary berm or containment wall at the north side of the property to prevent the overflow of aggregate encroaching onto the Otay Landfill property and into an off-site storm drain inlet; providing a permanent solution to contain any overflow onto the Otay Landfill property within twenty-one days and to identify a time frame when this would be completed; stabilizing the lot area located by the scales and office trailer to prevent dirt tracking onto Energy Way; securing the fiber rolls around the site's storm drain inlets with either stakes or gravel bags; adding additional fiber rolls on the south slope; and providing BMPs to prevent irrigation water from entering into the inlet located by the scale. Visual observations conducted by a Coastkeeper representative on January 29, 2021 confirm the Facility continues to lack BMPs that meet the BAT/BCT requirements of the Industrial General Permit.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the Industrial General Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See* Ex. 2. These violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Industrial

---

[19] *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in violation since March 26, 2016, and Coastkeeper and CERF will update the dates of violations when additional information and data become available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that the 2015 and 2020 Permit Effluent Limitation V.A is an independent requirement that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with Effluent Limitation V.A.

### 3.3. <u>Discharges of Polluted Storm Water from the Facility in Violation of Industrial General Permit Receiving Water Limitations.</u>

The Receiving Water Limitations of the 2015 and 2020 Permits prohibit storm water discharges and authorized NSWDs that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[20] 2015 & 2020 Permits § VI.A. The CTR and Basin Plan are applicable WQSs under the Industrial General Permit. Discharges that contain pollutants in excess of an applicable WQS violate the Industrial General Permit Receiving Water Limitations. *Id*.

Receiving Water Limitation VI.B of the 2015 and 2020 Permits prohibits storm water discharges and authorized NSWDs to surface water that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Industrial General Permit Receiving Water Limitation. 2015 & 2020 Permits § VI.B.

Information available to Coastkeeper and CERF, including the Facility's own storm water monitoring data, the extensive gaps and shortcomings of the Facility's monitoring data, inspections and citations from the City of Chula Vista, and direct observations, as described extensively in Sections 3.1 and 3.2 *supra*, indicate the Facility routinely discharges various aggregates, dirt, mud, sediment and/or sediment laden water, and other various other solids in excess of applicable WQSs. For example, the aforementioned evidence indicates the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality Objectives.

---

[20] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to the impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the CTR standards and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–67 (9th Cir. 1999).

The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31. High total dissolved solids concentrations in irrigation waters can be deleterious to plants directly, or indirectly through adverse effects on soil permeability. *Id*. at 3-32. Agricultural supply is a designated beneficial use of the lower segment of the Otay River. Receiving water monitoring data indicates the Otay River is impaired for TDS, bacteria, nitrogen and phosphorus. As such, the Facility's polluted discharges cause and/or contribute to the Otay River's TDS impairment.

The Basin Plan is an applicable WQSs under the Industrial General Permit. Therefore, the Facility's ongoing storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the Industrial General Permit. 2015 & 2020 Permits § VI.A. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the Industrial General Permit Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Industrial General Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See* Ex. 2. Each time discharges of storm water from the Facility cause and/or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation VI.A of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges of storm water from the Facility adversely impact human health or the environment, it is a separate and distinct violation of Receiving Water Limitation VI.B of the 2015 and 2020 Permits, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Industrial General Permit Receiving Water Limitations. The Facility Owners and/or Operators have been in violation since at least March 26, 2016, and Coastkeeper and CERF will update the dates of violation when additional information and data becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

Further, Coastkeeper and CERF put the Facility Owners and/or Operators on notice that Receiving Water Limitations are independent Industrial General Permit requirements that must be complied with, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 and 2020 Permits does not amount to compliance with the Receiving Water Limitations.

### 3.4. <u>Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan</u>.

The Industrial General Permit requires permittees to develop and implement a Storm Water Pollution Prevention Plan prior to conducting industrial activities. 2015 & 2020 Permits §§ X.A–B. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 2015 & 2020 Permits § X.C. A permittee has an ongoing obligation to revise the SWPPP as necessary to ensure compliance with the Industrial General Permit.

The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan ("MIP"). 2015 & 2020 Permits §§ X.A–I.

Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the Industrial General Permit. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2. Dischargers are also required to conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. 2015 & 2020 Permits §§ X.B, XV.

The Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. First, the Facility site map fails to include almost all of the information required by the Industrial General Permit. The site map includes only the Facility boundary, and delineations of the four drainage areas, DA-1 through DA-4. Thus the site map fails to include other required elements such as flow direction within each drainage area, storm drain inlets, locations of all storm water collection and conveyance systems, discharge locations, locations and descriptions of structural control

measures, identification of all impervious surfaces, location of all industrial materials exposed to precipitation, and all areas of industrial activity including all areas of material storage, shipping and receiving, fueling, equipment storage and maintenance, material handling and processing, and dust or particulate generation. *See* 2015 & 2020 Permits § X.E.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment. The industrial General Permit requires dischargers to "ensure that the SWPPP includes a *narrative* assessment of all areas of industrial activity with potential industrial pollutant sources." 2015 & 2020 Permits § X.G.2 (emphasis added). This assessment shall include "pollutants likely to be present in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.ii), "[t]he degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water," (§ X.G.2.a.iv), "[t]he direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs," (§ X.G.2.a.v), and "[t]he effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs," (§ X.G.2.a.vii), among other requirements.

The Facility SWPPP fails to comply with any of the aforementioned requirements. The SWPPP acknowledges that processes or materials that are directly exposed to precipitation and may affect stormwater runoff water quality include: asphaltic and concrete-based grindings and/or road-base materials; storage of such grindings and materials; various outdoor equipment storage; and general waste storage areas. 2015 SWPPP §§ 2.1, 3.1.1. However, the Facility SWPPP's table of potential pollutant sources assesses only maintenance and spills related to vehicle and equipment maintenance, and spills and leaks "inside buildings" of materials such as coolants, hydraulic fluids, and oils. 2015 SWPPP Table 4-6. Hence, the SWPPP entirely fails to address pollutant contributions of the primary industrial operations conducted at the Facility including loading, unloading, processing, screening, and storing waste asphalt, concrete, and other waste base road materials for recycled use. Further, the SWPPP's list of significant materials only includes hydraulic fluids, gasoline, diesel fuel, and anti-freeze/coolant. Thus, the SWPPP's pollutant source assessment completely ignores all of the industrial materials stored in massive stockpiles outdoors, exposed to storm water.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, the commingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the Industrial General Permit. As discussed in Section 3.2, *supra*, City of Chula Vista inspection records identified numerous deficiencies in the Facility's storm water BMPs. On November 27, 2017, Chula Vista officials directed the Facility Owners and/or Operators to address numerous BMP deficiencies including containing and preventing the overflow of aggregate encroaching onto the Otay Landfill property and into an off-site storm drain inlet; stabilizing the lot area located by the scales and office trailer to prevent dirt tracking onto Energy Way; securing the fiber rolls around the site's storm drain inlets; adding additional fiber rolls on the south slope; and providing BMPs to prevent irrigation water from entering into the inlet located by the scale. Visual observations conducted by a Coastkeeper representative on January 29, 2021 confirm the Facility continues to lack

BMPs that comply with requirements of the Industrial General Permit. Numerous fiber rolls were in disrepair and clearly ineffective, storm drain channels were full of debris, and numerous industrial materials and equipment were exposed to storm water without BMPs implemented to minimize exposure or prevent the discharge of pollutants. The Facility's ongoing failures to implement adequate BMPs violates numerous provisions of the Industrial General Permit's SWPPP requirements including, but not limited to, Sections X.H.1.a.ii, X.H.1.a.iv, and X.H.1.a.vii.

The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. 2015 & 2020 Permits, § X.B. Despite the numerous corrections required by the City of Chula Vista's November 27, 2017 inspection report and January 5, 2018 citation, the Facility Owners and/or Operators have failed to revise the Facility SWPPP. The Facility SWPPP dated June 10, 2015, and uploaded to the SMARTS database on June 26, 2015, is the only version of the Facility SWPPP publicly available.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise the Facility SWPPP in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit SWPPP requirements since at least March 26, 2016. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

### 3.5. <u>Failure to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan</u>.

The Industrial General Permit requires permittees to develop and implement a storm water MIP prior to conducting industrial activities. 2015 & 2020 Permits, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the Industrial General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70. The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

Sections XI.B.1–5 of the 2015 and 2020 Permits require permittees to collect storm water discharge samples from a qualifying storm event ("QSE")[21] as follows: (1) from each drainage area at all discharge locations, (2) from two (2) storm events within the first half of each Reporting Year (July 1 to December 31), (3) from two (2) storm events within the second half of each Reporting Year (January 1 to June 30), and (4) within four hours of the start of a discharge, or the start of Facility operations if the qualifying storm event occurs within the previous 12-hour period. The Industrial General Permit requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized NSWDs. 2015 & 2020 Permits § XI.A.1.

Sections XI.B.6.a–b of the 2015 and 2020 Permits require permittees to analyze samples for TSS, O&G, and pH. Section XI.B.6.c–d of the 2015 and 2020 Permits require permittees to analyze samples for all pollutants associated with the Discharger's industrial activities. Specifically, Facility Owners and/or Operators are required to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. 2015 & 2020 Permits § XI.B.6.c. Section XI.B.6.e of the 2015 and 2020 Permits also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with a Clean Water Act Section 303(d) listed impairment(s), or approved Total Maximum Daily Loads.

The Facility Owners and/or Operators have conducted and continue to conduct operations with an inadequately developed, implemented, and/or revised MIP. The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit. As discussed in Sections 1.3 and 2.2, *supra*, SIC code 5093 applies to the Facility because it is "primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials."[22] According to the 2015 SWPPP, the Facility "recycles used concrete and asphalt from the industrial process," and thus fits squarely within this category. *See* 2015 SWPPP § 3.1.4. The Industrial General Permit requires Facility's categorized under SIC code 5093 to analyze all storm water samples for iron, lead, aluminum, zinc, and COD. 2015 & 2020 Permits, Table 1. The Facility has failed to sample for any of these parameters in violation of the Industrial General Permit.

Additionally, the Facility has failed to sample for additional parameters that would indicate the presence of all industrial pollutants, pursuant to Section XI.B.6.c of the Industrial General Permit. As noted in Section 2.2, *supra*, information available to Coastkeeper and CERF indicates pollutants associated with the Facility's industrial activities and materials include TSS, pH, COD, lead, iron, zinc, BOD, aluminum, arsenic, cadmium, chromium, benzene, O&G, TDS,

---

[21] A qualifying storm event is defined as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 & 2020 Permits § XI.B.1.

[22] NAICS Association, *Industry: 5093—Scrap and Waste Materials*, https://www.naics.com/sic-industry-description/?code=5093#:~:text=Establishments%20primarily%20engaged%20in%20assembling,in%20dismantling%20automobiles%20for%20scrap (last visited Mar. 22, 2021).

nitrogen, and phosphorus. The Facility Owners and/or Operators have failed to analyze samples for any of these parameters in violation of the Industrial General Permit.

Further, the Facility Owners and/or Operators failed to comply with the Industrial General Permit's requirements for sample holding times and sample handling procedures rendering almost all of the Facility's sampling data invalid. Not a single sample collected by the Facility was received by the laboratory within 48 hours, as required by Section XI.B.8 of the 2015 and 2020 Permits. *See also* 2015 & 2020 Permits Attachment H, ¶ 2. For example, the Facility's most recent sample, collected November 8, 2020, was not received by the lab until November 17, 2020. The Facility Owners and/or Operators also failed to comply with the Industrial General Permit's requirements for sample holding times for approved test methods. *See* 2015 & 2020 Permits § XI.B.10. For example, all but one of the Facility's samples exceeded the holding time of seven days for the approved test method for TSS (SM 2450-D), primarily because the Facility failed to deliver the samples to the lab for analysis within the required time frame. *See* 40 C.F.R. § 136.3. Many of the Facility's samples also exceeded the holding time for the approved test method for O&G (EPA 1664A) of twenty-eight days. For example, samples collected on December 16, 2016 were not received by the lab until February 16, 2017, two months later.

The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Industrial General Permit. *See* 2015 & 2020 Permits § XI.B.4. While Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. The Facility's own SWPPP and site map identify four drainage areas. However, the SWPPP only identifies three discharge locations and sampling points, specifically failing to account for the storm water discharge point from DA-3, the Facility's largest drainage area, which accounts for the majority of its industrial activities and materials. As such, the Facility has failed to collect a single storm water sample from DA-3, and thus the Facility's monitoring data fails to accurately reflect the Facility's true pollutant load contributions. Furthermore, while the Facility's SWPPP and site map identify three separate discharge and sampling points, the Facility has never collected samples from all three of these discharge points. Storm water samples collected on September 15, 2015, December 16, 2016, and February 27, 2017 were taken from only two locations, labeled "north" and "south." Storm water samples collected on November 29, 2018, May 14, 2019, and November 8, 2020 were collected from only one discharge point. The Facility's repeated and ongoing failure to collect samples from all drainage areas and discharge points violates the Industrial General Permit.

The Facility Owners and/or Operators have failed and continue to fail to collect the required number of storm water samples for each reporting period. The Industrial General Permit requires Facilities to collect four samples each reporting period. However, the Facility has failed collect four samples during any reporting period since 2015. For example, the Facility failed to collect any samples during the 2019–2020 or 2017–2018 reporting periods, collected only one

sample during the 2015–2016 reporting period, and collected only two samples during each of the 2016–2017 and 2018–2019 reporting periods. Numerous QSEs occurred during each reporting period, as evidenced by Exhibit 2. Thus, the Facility's Owners and/or Operators failure to collect the required number of storm water samples during each reporting period violates the Industrial General Permit.

Finally, the Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Information available to Coastkeeper and CERF, including documentation from the City of Chula Vista, direct observations, the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, and the Facility's failure to collect the required number of storm water samples, indicates the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a MIP, in violation of the Industrial General Permit. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the Industrial General Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit MIP requirements since at least March 26, 2016. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

### 3.6.  Failure to Comply with the Industrial General Permit's Reporting Requirements.

The 2015 Permit requires Permittees to submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event. 2015 & 2020 Permits § XI.B.11.a. The Facility Owners and/or Operators failed to comply with these reporting requirements. For example, Facility Owners and/or Operators uploaded storm water sampling lab reports dated February 27, 2017 and March 21, 2017, to the SMARTS database on June 26, 2017, well over thirty days after they were received.

The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 & 2020 Permits, (2) an explanation for any noncompliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation. 2015 & 2020 Permits § XVI. The Industrial General Permit requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. 2015 & 2020 Permits §

XXI.K. The Facility Owners and/or Operators failed to submit an annual report for each reporting period until 2019–2020. As such the Facility failed to comply with any of these provisions during each prior reporting period.

In each Annual Report, the Facility Owners and/or Operators certify that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the Industrial General Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Industrial General Permit, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

The Facility's 2019–2020 annual report was certified attesting to the Facility's compliance with the terms of the Industrial General Permit. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. As discussed throughout Section 3 of this Notice Letter, the Facility has violated, and continues to violate, numerous provisions of the Industrial General Permit. The Facility's Legally Responsible Person knew or should have known the Facility had failed to comply with numerous procedural and substantive provisions of the Industrial General Permit, and thus certifications of these annual reports were erroneous.

Given that the Facility Owners and/or Operators have failed to comply with the Industrial General Permit's reporting requirements and falsified reports and certification, the Facility is in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Industrial General Permit is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's reporting requirements every day since at least March 26, 2016. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 26, 2016.

### 3.7. <u>Failure to Comply with Exceedance Response Action Requirements</u>.

The 2015 and 2020 Permits incorporates a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The NALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs as required by the 2015 and 2020 Permits.

When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020 Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id.* § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id.* The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id.* §§ XII.C.1.a–b. The evaluation must include the identification of the "corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *Id.* § XII.C.1.c. "Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated." *Id.*

Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level 1 status. *Id.* § XII.C.2. The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. *Id.* §§ XII.C.2.a.i–ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id.* A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.* § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id.* § D.

The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations, and are not derived directly from either BAT/BCT requirements or receiving water objectives. *Id.* § I.M.63. As such, NAL exceedances are not, in and of themselves, violations of the Industrial General Permit. *Id.* However, NAL exceedances indicate that a given facility's overall pollutant control performance is poor. *Id.* § I.M.61. Furthermore, "[a] Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit." *Id.* § I.M.63.; 2020 Permit § I.N.77.

The Facility Owners and/or Operators have failed to comply with several of the Industrial General Permit's ERA requirements. The Facility's storm water monitoring data from the 2015–16 reporting period shows the Facility exceeded the applicable NALs for TSS and O&G. As such, the Facility entered Level 1 status for the aforementioned parameters on July 1, 2016. The Facility Owners and/or Operators submitted a Level 1 ERA Report on March 13, 2017.

Information available to Coastkeeper and CERF indicates the Owners and/or Operators failed to complete a Level 1 ERA evaluation by October 1, 2016, as required by Section XII.C.1 of the Permit. The Facility Owners and/or Operators further failed to submit a Level 1 ERA report, complete SWPPP revisions, and implement any BMPs identified in the evaluation by the statutory deadline of January 1, 2017. *See* 2015 & 2020 Permits § XII.C.2 of the 2015 Permit.

The Facility's Level 1 ERA Report is also factually inaccurate. The report states that the Facility was required to submit a Level 1 ERA Report because the Facility failed to submit its monitoring data to SMARTS. While the Facility Owners and/or Operators did fail to timely submit such monitoring data, the Facility entered Level 1 status due to discharging extremely high concentrations of TSS and O&G, as evidenced by the Facility's own sampling data collected on September 15, 2015, and uploaded to SMARTS on November 13, 2015. The Facility's Level 1 ERA Report fails to acknowledge any sampling data or NALs exceedances, and as such fails to comply with the Level 1 ERA requirements of the Industrial General Permit. Additionally, as discussed extensively *supra*, City of Chula Vista inspection documents and Coastkeeper's direct observations indicate the Facility failed to develop and implement BMPs "necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit." *See* 2015 & 2020 § XII.C.1.c. Coastkeeper and CERF note, as has also been discussed *supra*, the Facility's sampling data is largely invalid, incomplete, and fails to reflect the actual quality of the Facility's storm water and non-storm water discharges. Thus, a lack of recent NALs exceedances in the Facility's sampling data has little bearing on the efficacy of the Facility's BMPs, or the quality of its storm water discharges.

The Facility Owners and/or Operators have failed and continue to fail to conduct adequate Level 1 status evaluation and report that complies with the Industrial General Permit. As such, the Facility Owners and/or Operators are in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate Level 1 status evaluation, and/or without submitting adequate Level 1 ERA Reports, is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's Level 1 status ERA evaluation requirement every day since October 1, 2016. The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit for failing to submit adequate Level 1 ERA Reports every day since January 1, 2017. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Industrial General Permit's requirements.

## 4.   RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law

authorize civil penalties of $55,800.00 per day per violation for violations that occurred after November 2, 2015.

      In addition to civil penalties, Coastkeeper and CERF will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper and CERF will seek to recover their litigation costs, including attorneys' and experts' fees.

## 5. CONCLUSION

      Coastkeeper and CERF are willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper and CERF intend to file a citizen suit under Section 505(a) of the Clean Water Act for the District's violations of the Industrial General Permit.

      If you wish to pursue settlement discussions, please contact Coastkeeper and CERFs legal counsel:

| | |
|---|---|
| Matt O'Malley<br>Patrick McDonough<br>matt@sdcoastkeeper.org<br>San Diego Coastkeeper<br>3900 Cleveland Ave., Ste. 102<br>San Diego, California 92103<br>Tel: 619-758-7743 | Marco Gonzalez<br>Livia Borak Beaudin<br>livia@coastlaw.com<br>Coast Law Group, LLP<br>1140 South Coast Highway 101<br>Encinitas, California 92024<br>Tel: 760-942-8505 |

Sincerely,

Matt O'Malley
Patrick McDonough
Attorneys for San Diego Coastkeeper

Marco Gonzalez
Livia Borak Beaudin
**Attorneys for Coastal Environmental Rights Foundation**

Notice of Intent to Sue: Clean Water Act
*Reclaimed Aggregates, Inc.*
March 26, 2021
Page 27

## SERVICE LIST

<u>VIA U.S. MAIL</u>

David Gibson
Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, California 92108

Michael S. Regan, Administrator
Environmental Protection Agency
Office of the Administrator 1101A
1200 Pennsylvania Ave N.W
Washington, DC 20460

Deborah Jordan
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812–0110

Exhibit 1
Storm Water Sampling Data from Reclaimed Aggregates, Inc.

| No. | Date of Sample Collection | Sample Location | Parameter | Units | Result | EPA Benchmark |
|---|---|---|---|---|---|---|
| 1 | 9/15/15 | #1 North | TSS | mg/L | 740 | 100 |
| 2 | 9/15/15 | #1 North | TSS | mg/L | 120 | 100 |
| 3 | 9/15/15 | #2 South | Oil & Grease | mg/L | 27 | 15 |

**Exhibit 2: Precipitation Data for Reclaimed Aggregates, Inc. Facility**
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service
Record of Climatological Observations
Station: SAN DIEGO BROWN FIELD, CA, US. Station ID: GHCND:USW00003178
Location Elev: 515 ft., Lat: 32.57222° N, Lon: -116.97944°

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 3/5/2016 | 0.01 | 1/11/2017 | 0.05 |
| 3/6/2016 | 0.23 | 1/12/2017 | 0.34 |
| 3/7/2016 | 0.55 | 1/13/2017 | 0.74 |
| 3/11/2016 | 0.19 | 1/14/2017 | 0.04 |
| 3/30/2016 | 0.05 | 1/18/2017 | 0.04 |
| 4/7/2016 | 0.27 | 1/19/2017 | 0.49 |
| 4/8/2016 | 0.14 | 1/20/2017 | 0.79 |
| 4/9/2016 | 0.06 | 1/22/2017 | 0.22 |
| 4/10/2016 | 0.55 | 1/23/2017 | 0.73 |
| 4/23/2016 | 0.01 | 1/24/2017 | 0.25 |
| 4/27/2016 | 0.01 | 2/7/2017 | 0.19 |
| 5/6/2016 | 0.73 | 2/11/2017 | 0.03 |
| 5/7/2016 | 0.04 | 2/17/2017 | 1.28 |
| 5/30/2016 | 0.03 | 2/18/2017 | 0.28 |
| 9/20/2016 | 0.73 | 2/19/2017 | 0.06 |
| 9/21/2016 | 0.01 | 2/26/2017 | 0.07 |
| 10/31/2016 | 0.01 | 2/27/2017 | 2.21 |
| 11/20/2016 | 0.06 | 2/28/2017 | 0.06 |
| 11/21/2016 | 0.45 | 3/5/2017 | 0.01 |
| 11/26/2016 | 0.15 | 3/21/2017 | 0.01 |
| 11/27/2016 | 0.24 | 3/22/2017 | 0.03 |
| 11/28/2016 | 0.05 | 3/23/2017 | 0.04 |
| 12/1/2016 | 0.01 | 5/6/2017 | 0.06 |
| 12/16/2016 | 0.98 | 5/7/2017 | 1.25 |
| 12/20/2016 | 0.01 | 5/8/2017 | 0.01 |
| 12/21/2016 | 0.52 | 7/24/2017 | 0.01 |
| 12/22/2016 | 0.8 | 9/3/2017 | 0.02 |
| 12/23/2016 | 0.01 | 9/8/2017 | 0.08 |
| 12/24/2016 | 0.85 | 9/21/2017 | 0.03 |
| 12/30/2016 | 0.25 | 11/7/2017 | 0.31 |
| 12/31/2016 | 0.74 | 12/20/2017 | 0.09 |
| 1/1/2017 | 0.03 | 1/8/2018 | 0.07 |
| 1/5/2017 | 0.19 | 1/9/2018 | 1.29 |
| 1/9/2017 | 0.06 | 1/10/2018 | 0.22 |

**Exhibit 2: Precipitation Data for Reclaimed Aggregates, Inc. Facility**

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 2/12/2018 | 0.02 | 1/18/2019 | 0.01 |
| 2/14/2018 | 0.06 | 1/21/2019 | 0.01 |
| 2/18/2018 | 0.03 | 1/31/2019 | 0.41 |
| 2/19/2018 | 0.04 | 2/1/2019 | 0.01 |
| 2/23/2018 | 0.02 | 2/2/2019 | 1.19 |
| 2/27/2018 | 0.76 | 2/4/2019 | 0.25 |
| 3/3/2018 | 0.02 | 2/5/2019 | 0.26 |
| 3/10/2018 | 0.39 | 2/6/2019 | 0.01 |
| 3/13/2018 | 0.02 | 2/10/2019 | 0.04 |
| 3/14/2018 | 0.04 | 2/13/2019 | 0.51 |
| 3/15/2018 | 0.13 | 2/14/2019 | 1.03 |
| 3/17/2018 | 0.37 | 2/15/2019 | 0.09 |
| 3/18/2018 | 0.02 | 2/16/2019 | 0.02 |
| 3/22/2018 | 0.03 | 2/17/2019 | 0.18 |
| 3/23/2018 | 0.01 | 2/18/2019 | 0.21 |
| 4/19/2018 | 0.06 | 2/20/2019 | 0.41 |
| 4/30/2018 | 0.01 | 2/21/2019 | 0.37 |
| 5/2/2018 | 0.06 | 3/2/2019 | 0.14 |
| 5/12/2018 | 0.04 | 3/3/2019 | 0.01 |
| 5/20/2018 | 0.01 | 3/5/2019 | 0.01 |
| 5/21/2018 | 0.02 | 3/6/2019 | 0.1 |
| 10/5/2018 | 0.02 | 3/7/2019 | 0.03 |
| 10/12/2018 | 0.09 | 3/8/2019 | 0.12 |
| 11/22/2018 | 0.13 | 3/11/2019 | 0.4 |
| 11/29/2018 | 0.91 | 3/12/2019 | 0.04 |
| 11/30/2018 | 0.14 | 3/20/2019 | 0.02 |
| 12/1/2018 | 0.02 | 3/21/2019 | 0.05 |
| 12/5/2018 | 0.61 | 4/3/2019 | 0.08 |
| 12/6/2018 | 1.07 | 4/6/2019 | 0.02 |
| 12/25/2018 | 0.27 | 4/16/2019 | 0.03 |
| 12/31/2018 | 0.01 | 4/28/2019 | 0.01 |
| 1/5/2019 | 0.11 | 4/29/2019 | 0.04 |
| 1/6/2019 | 0.27 | 4/30/2019 | 0.11 |
| 1/12/2019 | 0.36 | 5/5/2019 | 0.02 |
| 1/14/2019 | 0.52 | 5/6/2019 | 0.01 |
| 1/15/2019 | 0.13 | 5/10/2019 | 0.02 |
| 1/17/2019 | 0.24 | 5/11/2019 | 0.03 |

**Exhibit 2: Precipitation Data for Reclaimed Aggregates, Inc. Facility**

| Date | Daily Precipitation (inches) | Date | Daily Precipitation (inches) |
|---|---|---|---|
| 5/16/2019 | 0.04 | 3/7/2020 | 0.02 |
| 5/19/2019 | 0.38 | 3/8/2020 | 0.15 |
| 5/20/2019 | 0.12 | 3/9/2020 | 0.15 |
| 5/21/2019 | 0.12 | 3/10/2020 | 0.38 |
| 5/22/2019 | 0.12 | 3/12/2020 | 0.39 |
| 5/26/2019 | 0.19 | 3/13/2020 | 0.3 |
| 6/21/2019 | 0.03 | 3/14/2020 | 0.04 |
| 6/24/2019 | 0.01 | 3/16/2020 | 0.24 |
| 9/4/2019 | 0.14 | 3/17/2020 | 0.2 |
| 9/25/2019 | 0.02 | 3/18/2020 | 0.46 |
| 9/27/2019 | 0.02 | 3/19/2020 | 0.29 |
| 11/19/2019 | 0.41 | 3/22/2020 | 0.03 |
| 11/20/2019 | 1.04 | 3/23/2020 | 0.21 |
| 11/21/2019 | 0.62 | 3/25/2020 | 0.02 |
| 11/27/2019 | 0.29 | 3/26/2020 | 0.06 |
| 11/28/2019 | 1.69 | 3/27/2020 | 0.53 |
| 11/29/2019 | 0.26 | 4/5/2020 | 0.01 |
| 11/30/2019 | 0.11 | 4/6/2020 | 0.22 |
| 12/3/2019 | 0.04 | 4/7/2020 | 0.64 |
| 12/4/2019 | 1.61 | 4/8/2020 | 0.57 |
| 12/6/2019 | 0.15 | 4/9/2020 | 0.32 |
| 12/7/2019 | 0.16 | 4/10/2020 | 1.51 |
| 12/8/2019 | 0.05 | 4/12/2020 | 0.02 |
| 12/23/2019 | 1.43 | 4/13/2020 | 0.03 |
| 12/24/2019 | 0.34 | 4/18/2020 | 0.04 |
| 12/25/2019 | 0.03 | 6/5/2020 | 0.03 |
| 12/26/2019 | 1.13 | 6/29/2020 | 0.05 |
| 1/9/2020 | 0.07 | 10/25/2020 | 0.12 |
| 1/17/2020 | 0.04 | 11/6/2020 | 0.02 |
| 1/20/2020 | 0.01 | 11/7/2020 | 0.21 |
| 1/21/2020 | 0.19 | 11/8/2020 | 0.21 |
| 2/9/2020 | 0.12 | 12/14/2020 | 0.08 |
| 2/10/2020 | 0.41 | 12/17/2020 | 0.04 |
| 2/22/2020 | 0.25 | 12/24/2020 | 0.01 |
| 2/23/2020 | 0.01 | 12/28/2020 | 0.8 |
| 3/1/2020 | 0.09 | 12/29/2020 | 0.03 |
| 3/2/2020 | 0.05 | 1/20/2021 | 0.02 |

**Exhibit 2: Precipitation Data for Reclaimed Aggregates, Inc. Facility**

| Date | Daily Precipitation (inches) |
|---|---|
| 1/21/2021 | 0.01 |
| 1/22/2021 | 0.01 |
| 1/23/2021 | 0.42 |
| 1/24/2021 | 0.2 |
| 1/25/2021 | 0.32 |
| 1/29/2021 | 1.11 |
| 2/12/2021 | 0.03 |
| 2/13/2021 | 0.02 |
| 2/16/2021 | 0.19 |
| 2/16/2021 | 0.19 |
| 3/3/2021 | 0.77 |
| 3/10/2021 | 0.62 |
| 3/11/2021 | 0.15 |
| 3/12/2021 | 0.02 |
| 3/13/2021 | 0.04 |
| 3/15/2021 | 0.15 |
| 3/16/2021 | 0.06 |